UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA            :
                                    :
        v.                          :        CR 11-58 ML
                                    :
EVGUENI TETIOUKHINE, a/k/a          :
JOHN DOE                            :


**MEMORANDUM AND ORDER**

**SETTING CONDITIONS OF RELEASE**

On April 20, 2011, Defendant Evgueni Tetioukhine a/k/a John
Doe a/k/a Fionghal Solomon MacEoghan ("Defendant") appeared before
the Court for arraignment on the above numbered Indictment (Docket
("Dkt.") #13).   After pleading not guilty to all counts, the
Government requested that Defendant continue to be detained in
accordance with the Detention Order Pending Trial (Dkt. #6) which
this Magistrate Judge had entered on November 15, 2010, based on
the underlying Criminal Complaint (Dkt. #1) ("Complaint").[1]
Counsel for Defendant, Assistant Federal Defender Mary S. McElroy
("Ms. McElroy"), objected to the Government's request and argued
that the Court should set conditions of release.   She noted that
Defendant had not sought release at the time of his initial
appearance but had not waived his right to seek release at a later

_____

[1] The Criminal Complaint ("Complaint") was filed in United States
v. John Doe a/k/a Fionghal Solomon MacEoghan a/k/a Evgenij MacEoghan,
Case No. 1:10-MJ-255M.

date.[2]  After listening to further argument from both sides, the Court continued the matter to April 21, 2011, and directed counsel for Defendant to submit a written statement listing the properties which she had indicated during her argument various persons were willing to post as bail for Defendant.

The hearing resumed on April 21st, and the Court heard further argument regarding whether conditions of release could be set. After hearing from counsel and questioning two of the individuals who were prepared to post bail for Defendant, the Court found that conditions of release could be set.[3]  After announcing those conditions, counsel for the Government requested that the Court stay the order setting conditions of release to allow the Government to seek review by the Chief Judge.  The Court thereupon stayed the order and stated that it would issue a written order. This is that written order.

## I. Issue

The issue to be determined is whether there is any condition or combination of conditions of release which will reasonably assure the appearance of Defendant as required and the safety of

---

[2] According to the Court's notes, Ms. McElroy indicated at the November 10, 2010, initial appearance that Defendant had declined to be interviewed on her advice.  She explained that she wanted to consult first with an immigration attorney and also determine who was going to represent Defendant as he had made contact with a private attorney. Defendant was interviewed by the Probation Department on April 20, 2011.

[3] The two individuals questioned by the Court were Mr. Mike Gonet, Defendant's employer, and Ms. Lynda Avanzato, an attorney and friend of Defendant and his wife.

any other person and the community.  See 18 U.S.C. § 3142(e).

## II.  Standard

The Government has the burden of persuading the Court by a preponderance of the evidence that "'no condition or combination of conditions will reasonably assure' the defendant's presence at trial." United States v. Parra, No. 92-1839, 1992 WL 226046, at *4 (1st Cir. Sept. 17, 1992)(quoting United States v. Perez Franco, 839 F.2d 867, 870 (1st Cir. 1988)); see also United States v. Arroyo-Reyes, No. 94-1535, 1994 WL 440654, at *3 (1st Cir. Aug. 15, 1994)("The government unquestionably bears the burden of proof at a pretrial detention hearing."); United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991)(upholding district court's application of preponderance of the evidence standard); United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991)(affirming "district court's determination that the government established by a preponderance of the evidence that no combination of conditions of release will reasonably assure [defendant]'s presence at trial"). "In contrast, proof that no conditions of release will reasonably assure the safety of any other person or the community must be by 'clear and convincing evidence.'" Parra, 1992 WL 226046, at *4 (quoting 18 U.S.C. § 3142(f)).  Courts must strive to impose the least restrictive bail conditions such that the defendant's appearance at trial and the public's safety are assured. United States v. Merlino, Criminal Action No. 99-363-01, 1999 U.S. Dist.

LEXIS 19114, at *6 (E.D. Pa. Dec. 15, 1999)(citing 18 U.S.C. §
3142(c)(1)(B)).

## III. Factors to Be Considered

In deciding the above issue, the Court is required to take
into account: (1) the nature and circumstances of the offense
charged, including whether the offense is a crime of violence; (2)
the weight of the evidence against Defendant; (3) the history and
characteristics of Defendant, including (A) his character, physical
and mental condition, family ties, employment, financial resources,
length of residence in the community, community ties, past conduct,
history relating to drug or alcohol abuse, criminal history, and
record concerning appearance at court proceedings; and (B) whether,
at the time of the current offense or arrest, Defendant was on
probation, parole, or other release pending trial, sentencing,
appeal, or completion of sentence for an offense under Federal,
State, or local law; and (4) the nature and seriousness of the
danger to any person or the community that would be posed by
Defendant's release.  See 18 U.S.C. § 3142(g).

## IV. Discussion of Factors

### A. Nature and Circumstances of Offense

#### 1. The Charges

Defendant is charged with nine counts: transmitting a
facsimile of a Uniform Residential Loan Application by wire for the
purpose of executing a scheme to defraud in violation of 18 U.S.C.

§ 1343 (Count 1); aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts 2 and 4); false use of a social security number in violation of 42 U.S.C. § 408(a)(7)(B) (Count 3); embezzlement in violation of 20 U.S.C. § 1097(a) (Count 5); making a false statement in an application for a passport in violation of 18 U.S.C. § 1542 (Count 6); identify theft in violation of 18 U.S.C. § 1028A (Counts 7 and 9); and making fraudulent statements and representations in a matter within the jurisdiction of a department or agency of the United States (Count 8).

### 2.  The Circumstances

The charges generally arise from (or relate to) Defendant's execution of four documents.  The allegations concerning those documents are summarized below.

### a.  The 1993 Passport Application

On or about January 22, 1993, Defendant executed a United States passport application at a U.S. Post Office in Providence, Rhode Island, and falsely identified himself as Fionghal Solomon MacEoghan.  Indictment ¶ 4.  As proof of his identity, Defendant presented a Rhode Island driver's license and a United States Department of State Consular Certificate of Birth, each in the name Fionghal Solomon Shamir MacEoghan.  Id. ¶ 5.  Based on the information in his application and proof of identity, Defendant was issued a United States passport in the name Fionghal Solomon Shamir MacEoghan.  Id. ¶¶ 4, 7.

### b. The 2002 Passport Renewal

On or about January 17, 2002, Defendant executed a United States passport renewal application in which he falsely stated that his name was Fionghal Solomon MacEoghan, that his social security number was ***-**-0131, and that he was a United States citizen. Id. ¶¶ 6, 25. As proof of identity, Defendant presented the United States passport issued in 1993 in the name Fionghal Solomon Shamir MacEoghan. Id. ¶ 7. These acts appear to be the basis for Count 6 (false statement in passport application) and Count 7 (identity theft).

### c. The 2007 Mortgage Loan Application

On or about February 21, 2007, Defendant and another person[4] submitted to Salem Five Mortgage Company a Uniform Residential Loan Application ("Mortgage Loan Application") for a $260,000 loan (the "Mortgage Loan") for the purchase of property at 63 Wildwood Avenue, Warwick, Rhode Island (the "Wildwood Avenue Property"). Id. ¶ 8. Defendant falsely stated on the Mortgage Loan Application that his name was Fionghal MacEoghan and that his social security number was ***-**-0131. Id. ¶¶ 8-10. The Mortgage Loan Application was approved and financing in the amount of $260,000 was provided for the purchase of the Wildwood Avenue Property. Id. ¶ 11. These actions appear to be the basis for Count 1

---

[4] Although the other person is not identified in the Indictment, it appears that the person was Defendant's wife, Olesya MacEoghan, as she and Defendant reside at 63 Wildwood Avenue, Warwick, Rhode Island.

(transmission of Uniform Residential Loan Application with fraudulent information), Count 2 (aggravated identity theft), and Count 3 (false use of social security number).

### d. The 2009 Student Loan Application

On or about January 15, 2009, Defendant completed a United States Department of Education, Free Application for Federal Student Aid ("Student Loan Application") using the web version. Id. ¶ 12. In completing the Student Loan Application, Defendant falsely stated that his name was "Fionghal S MacEoghan," id. ¶ 13, and that his social security number was ***-**-0131, id. ¶ 14. On or about January 21, 2009, Defendant signed a Master Promissory Note in which he represented that he was Fionghal S. MacEoghan and that his Social Security Number was ****-**0131. Id. ¶ 23. As a result of these misrepresentations, $14,756.84 in Department of Education student loan funds (the "Student Loan") were disbursed to Defendant through Johnson & Wales University in the form of an offset against tuition and fees. Id. ¶¶ 12-14, 23. These actions appear to be the basis for Count 5 (embezzlement), Count 8 (fraudulent statement), and Count 9 (identity theft).

### B. Weight of the Evidence

The Government represented at the hearing that it is in the possession of two passports from the former Union of Soviet Socialist Republics ("U.S.S.R.") which bear Defendant's photograph and reflect that his name is Evgueni Tetioukhine. Much of the

other evidence against Defendant is documentary in nature and reflects Defendant's repeated use of the name and social security number of Fionghal S. MacEoghan, a United States citizen who resides in Ireland, see Affidavit of John Keith Hollerman filed in support of search warrant for the Wildwood Avenue Property ("Hollerman Aff.") ¶ 4. Presumably based on this evidence the Grand Jury found probable cause to indict Defendant. While defense counsel stated at the hearing that Defendant has defenses to the charges, no further information regarding these defenses was provided. Based on the information available, the Court finds that the weight of the evidence is substantial.

At the same time, however, it bears noting that these offenses did not come to the attention of the authorities because Defendant failed to make required payments on either the Mortgage Loan or the Student Loan or because he engaged in criminal activity beyond assuming the identity of Fionghal Solomon MacEoghan. Rather, a somewhat serendipitous chain of events led to the arrest of Defendant and his wife.[5] In January 2010 the real Fionghal Solomon MacEoghan ("Victim MacEoghan") did a facebook search of his last name and located a female in the United States with the name Olesya Maceoghan[6] ("Olesya"), Defendant's wife. See Hollerman Aff. ¶ 8.

---

[5] The Complaint against Defendant's wife has been dismissed. See Order of Dismissal (Dkt. #21) in Case No. 1:10-MJ-254M.

[6] In the affidavit the spelling of the last name of Defendant and his wife appears in some instances as "Maceoghan." Affidavit of John Keith Hollerman filed in support of search warrant for the Wildwood

Conversations between Victim MacEoghan and Olesya ensued regarding a possible family relationship. See id. ¶¶ 8-9. Olesya's statements that her husband's middle name was also Solomon, id. ¶ 8, that he was born in Ireland and was "half Russian, half Irish," id., followed by her failure to respond to Victim MacEoghan's question as to the name of the hospital in which her husband was born apparently raised Victim MacEoghan's suspicions, see id. He did an internet search on the couple and located the 2007 real estate transaction for the purchase of the Wildwood Avenue Property. He also located information that reflected that Fionghal Solomon MacEoghan was among the students at Johnson and Wales University in Providence, Rhode Island. See id. ¶ 9. In addition, Victim MacEoghan uncovered emails from Olesya which confirmed that Defendant was of Russian heritage.[7] See id. When Victim MacEoghan

_____

Avenue Property ("Hollerman Aff.") ¶ 4.

[7] Among the documents which Victim MacEoghan turned over to the U.S. Embassy in Dublin on August 24, 2010, was a blog posting in Russian by Defendant's wife on a site called Rusnetusa.com. See Hollerman Aff. ¶ 22. According to the Hollerman Aff., the translation of that blog reads as follows:

> Hello – I'd like very much to receive answers (advice) to some questions that I'm wondering about. I got married in Yekaterinburg. My husband is Russian, but 12 years ago he received asylum and became an American (now he's changed everything – his first name, his last name, his life story). Now we're submitting an I-130 petition, he lives in Providence [sic], RI. – Does the place where the documents are submitted affect how long the process takes (they told us this would take about a year)? – When I go to Moscow for my interview, what should I say about how we met and how we communicate with each other (he's actually Russian, his parents live in Yekaterinburg, but that's not what his papers say – maybe I should stick to the version about his "American past" – after

9

confronted Olesya "with this information," id. (presumably that Defendant was using the same name as Victim MacEoghan and that Defendant was not half Irish), she "stated that it was only a coincidence," id. Victim MacEoghan last communicated with Defendant's wife on July 29, 2010. Id. Around the same time, he filed a report with the Dublin Police and also contacted the Warwick Police. See id. ¶ 10. An investigation involving federal and local authorities commenced which ultimately resulted in the arrest of both Defendant and his wife in early November 2010.

## C. History and Characteristics of Defendant

### 1. Character

The Government submitted no direct evidence regarding Defendant's character but presumably contends that because the offenses with which Defendant is charged involve fraud and he has a minor prior criminal record, he lacks good character. The defense noted the presence at each hearing of a group of persons who were supportive of Defendant and his wife and concerned for their welfare. Declarations were submitted by the defense from

---

all, according to his papers he now has a different life story, including about his parents)? – These days there's a lot of talk about new requirements for Russians in submitting I-130 documents. Where can I take a look at the new forms for filling out biographical information? Sincerely, Olesya

Id. ¶ 23. The date of this posting is not stated in the Hollerman Aff. According to records obtained by the Probation Department from the Bureau of Immigration and Customs Enforcement (ICE) Law Enforcement Support Center, Olesya entered the United States on October 15, 2004. Thus, the posting presumably occurred prior to this date.

thirteen persons, including Defendant's wife, all of whom express faith and confidence in Defendant and state their willingness to post bail. Among the thirteen declarants is Attorney Lynda Avanzato, a member of the Rhode Island bar, who was in attendance at both hearings. In her declaration, Attorney Avanzato states that she and her husband, Joseph Avanzato, who is also an attorney and a member of the Rhode Island bar, are willing to post the equity in their primary family residence in North Kingstown, Rhode Island, as bail for Defendant and that the amount of that equity is $107,000.

Also in attendance at the April 21st hearing was Mike Gonet ("Mr. Gonet"),[8] who states in his declaration that he employed Defendant for six years at Classic Metal Roof and promoted him to crew manager (foreman). Mr. Gonet further states:

> I got to know [Defendant] very well. I trusted him with both a company truck and company credit card. He is an honest, responsible, very reliable and trustworthy man. Since all our work was in MA, CT and NH I could not visit each site myself. I relied on Finn and never had any problems. He is a very hard worker, dedicated person whose professional opinion I always respected.
>
> About a year ago, he decided to start his own contractor company, and I was very supportive. I hired him as a sub-contractor for the "Classic Metal Roof."
>
> When Finn and his wife were arrested on 11/10/2010 his colleague at work[,] Alex Zaitsev[,] took a responsibility

---

[8] Mr. Gonet may also have been present at the April 20th hearing. The number of persons supportive of Defendant who were in attendance at the hearings is such that the Court cannot be certain that every individual present on April 20th was also present on April 21st.

11

for the business and started the "AZ Contracting, Inc."
company that I hired to do the jobs.  We miss Finn a lot
and the entire crew is anxious to have him back on board.
He is guaranteed his position back at "AZ Contracting,
Inc." once he is on bail.  The work is in CT and MA now,
and we hope he is granted the ability to work within this
area.   I also guarantee him a "Classic Metal Roof"
company truck back.

Declaration of Mike Gonet ("Gonet Decl.") ¶¶ 3-5.  Mr. Gonet

concludes his declaration by stating that he has "full faith [and]

confidence in [Defendant]," id. ¶ 8, and that he is willing to

pledge the $250,000 equity which he has in his home in Stow,

Massachusetts, as bail for Defendant, id. ¶ 8.

Marina Maslowski states in her declaration that she owns a

home in Alpharetta, Georgia, in which she has $184,000 in equity

and that she is willing to post this equity as bail.   See

Declaration of Marina Maslowski ("Maslowski Decl.") ¶ 2.   She

further declares: "I have full faith [and] confidence in him."  Id.

Several other declarants state that while they have little or

no equity in their primary residence due to economic conditions,[9]

they have full faith and confidence in Defendant and are willing to

post any equity they have.  For example, Irina Zhuravleva and Mark

Shelepov attest that they have known Defendant since his son was

born in 2007, that they know him to be "a very hard worker,

handyman and a professional roofer," Declaration of Irina

_____

[9] At the April 20, 2011, hearing the Court indicated that it
attaches more weight to the fact that a person is willing to post his or
her primary residence as bail compared to a willingness to post
investment property.

Zhuravleva & Mark Shelepov ("Zhuravleva & Shelepov Decl.") ¶¶ 2, 4, and offer that he "is a great father and husband," id. ¶ 5. Similar sentiments are expressed by Tatsiana Kiryanov and Alexandr Kiryanov who state that they have known Defendant and his wife for about four years and that their families socialize together. See Declaration of Tatsiana and Alexandr Kiryanov ("Kiryanov Decl.") ¶¶ 2, 3. Artem Dubrov indicates in his declaration that he has known Defendant and his wife for more than six years and "can attest to both the integrity of Evgueni, and his long ties to the community." Declaration of Artem Dubrov ("Dubrov Decl.") ¶¶ 2, 4. Alex Vilner ("Mr. Vilner") declares that he has known Defendant since 1991, "the year of his arrival in the US, when we met through a mutual acquaintance." Declaration of Alex Vilner ("Vilner Decl.") ¶ 2. Mr. Vilner states that "[o]ver the course of almost two decades, I got to know him very well. He is an honest, responsible, very reliable and trustworthy man." Id. ¶ 3. Although Mr. Vilner describes the equity in his primary residence in Lincoln, Rhode Island, as "negligible," id. ¶ 10, Mr. Vilner affirms that he is "ready to post a $15,000 cash bail, as a sign of my complete and utter confidence in Evgueni ...," id.

Anna Titova ("Ms. Titova") and Andrei Smuk ("Mr. Smuk") relate that they have known Defendant and his wife for more than five years, see Declaration of Anna Titova and Andrei Smuk ("Titova and Smuk Decl.") ¶ 2, and that they "are very proud to have friends

like them," id. ¶ 5.  Ms. Titova and Mr. Smuk indicate that they are willing to post the $15,000.00 equity which they have in their home located in Smithfield, Rhode Island.  See id. ¶ 6.  Matthew H. Leonard ("Mr. Leonard") states that he has known Defendant since 1992 when Defendant was employed at Accu-comp Inventory Systems, Inc.  See Declaration of Matthew Leonard ("Leonard Decl.") ¶¶ 2-3. At the time, Mr. Leonard was the Director of Operations at the company.  See id. ¶ 3.  He states "I got to know Evgueni quite well as his employer, and became a close friend with him after that.  He even spent holidays with my family."  Id.  Mr. Leonard further states that "I have been to his home, and am aware that he owns his own home, has a wife and son he is deeply committed to, and many friends in the community."  Id. ¶ 4.  Mr. Leonard concludes by offering to pledge the $6,000 equity in his North Kingstown, Rhode Island, home as bail.  See id.

Based on the attendance of most, if not all, of these persons at the hearings, the contents of their declarations, and especially the faith and confidence they express in Defendant as exemplified by their willingness to post their homes or cash as bail, the Court finds that Defendant has presented significant evidence of good character and that this evidence outweighs the evidence of bad character as evidenced by the charges and Defendant's minor past criminal record.  Thus, Defendant's character weighs in favor of release.

## 2. Physical and Mental Condition

Defendant is 40 years of age.  He told the Probation Department that overall he is in good physical health.  His wife reported that a few years ago he fell off a roof and suffered a stress fracture in one of his vertebrae which causes chronic back pain.  Defendant informed the Probation Department that he has never participated in mental health counseling and he is not experiencing any psychiatric problems or suicidal ideation.

## 3. Family Ties

Defendant is married.  Prior to his arrest, he and his wife resided together with their three year old son, Alexander MacEoghan, in the house on Wildwood Avenue in Warwick which they have owned since 2007.  Defendant told the Probation Department that he never met his biological father and that he has not had contact with his mother since 2003 and is unaware of her location.  Defendant also told the Probation Department that he was adopted by Laurence Albert McCoon in September 1991 and immigrated to the United States under the name Fionghal Solomon MacEoghan with a date of birth of January 16, 1969.  According to Defendant, Mr. McCoon was a genealogist in Philadelphia, Pennsylvania, and passed away on October 1, 2006, at the age of 68.  Defendant also reported that he has a step-sister, Deborah McCoon, approximately 25, who is a student in Pennsylvania, but he does not maintain regular contact with her.

I find that Defendant has strong family ties to the District of Rhode Island in that his wife and son reside here. In reaching this conclusion, the Court is influenced by Olesya's declaration in which she states, in part, that "[t]he only family he has is me and my son Alexander who was born here and who is also a USA citizen. My husband loves us greatly and would never leave us without his emotional and financial support." Declaration of Olesya Maceoghan (Radchouk) ("Olesya Decl.") ¶ 6.

### 4. Employment

Defendant told the pretrial services officer who interviewed him that from March 2004 to November 10, 2010, he was employed as a roofer earning $30 per hour at AZ Contracting, Inc. ("AZ Contracting"), a sub-contractor for Classic Metal Roof of Stow, Massachusetts. The pretrial services officer reports that Mr. Gonet, the owner of Classic Metal Roof, advised that if Defendant were released on bail he could return to his job at AZ Contracting and described him as an excellent worker. Defendant reported that from 2000 to 2002 he was a roofer earning approximately $25 per hour at Interlock Industries in Walpole, Massachusetts. Defendant was employed from 1999 until 2000 as a computer consultant earning approximately $58,000 per year at CBSI Company in Providence, Rhode Island. From 1998 until 1999, he was a warehouse manager at the Leviton Company in Warwick, Rhode Island, earning approximately $30,000 annually.

The Court finds that Defendant has a verified history of being steadily employed since at least 2004 and that, if released, he can return to his employment. Thus, this factor weighs strongly in favor of release. Mr. Gonet's willingness to appear in court and to post his residence as bail is persuasive evidence that Defendant is a valued and trusted employee.

### 5.  Financial Resources

According to the Probation Department, Defendant's only known asset is the family residence in Warwick. The tax assessors' database for the City of Warwick indicates that the house was purchased in March 2007 for $260,000 and that it has an assessed value of $263,300. Defendant's liabilities include a mortgage with an outstanding balance of $246,670[10] with a monthly payment of $2,500 and a Stafford Student Loan in the amount of $18,000. At the time Defendant and his wife were arrested in November 2010 their combined monthly income was $7,300 which was enough to meet their monthly expenses of $3,800. Since then, however, Olesya has lost her job and Defendant has been detained. In her declaration, Olesya states that they were never late in making a mortgage payment "until we were arrested on November 10th 2010." Olesya Decl. ¶ 3.

### 6.  Length of Residence in the Community

---

[10] The balance of the mortgage is taken from the Olesya Decl. <u>See</u> Olesya Decl. ¶ 4.

Defendant told the Probation Department that he has resided in Rhode Island since immigrating to the United States in 1991. Mr. Leonard states that he has known Defendant since 1992. <u>See</u> Leonard Decl. ¶ 2. The Court is satisfied that Defendant has resided in Rhode Island for a long period of time and that he has resided at the Wildwood Avenue Property since 2007.

### 7. Community Ties

As is plain from the evidence already discussed, Defendant has strong ties to the community. His wife and son are located in Rhode Island and he has several close friends in Rhode Island and nearby Massachusetts. Moreover, Defendant's most valuable asset appears to be his home in Warwick.

### 8. History Relating to Drug or Alcohol Abuse

Defendant told the Probation Department that he has never used illegal drugs and considers himself a social drinker. There is no evidence which contradicts these statements.

### 9. Past Conduct, Criminal History, and Record Concerning Appearance at Court Proceedings

Defendant has a minor criminal record. In January 1994 he pled nolo to a charge of malicious destruction of property and was sentenced to six months probation with restitution and payment of court costs. In December 1994 he pled nolo to a charge of shoplifting and again received six months probation plus court costs. Two years later, in November 1996, he pled nolo to

"Violation Order/Builders Inspection Board" and received six months of unsupervised probation plus court costs. All of these charges were in Rhode Island.

In October 1996 Defendant was adjudged guilty of larceny from a building in Attleboro District Court and received a ninety day suspended sentence with probation for one year and restitution. The record indicates that the restitution was paid and the probation terminated in October 1997.

Given the age of these offenses and the fact that none appear to be felonies, the Court finds that Defendant's prior criminal record does not weigh significantly against release on bail. There is no credible evidence that a warrant has ever been issued for Defendant because he missed a court proceeding.[11]

### 10. Status at Time of Current Offense

Defendant was not at the time of the current offense or arrest on probation, parole, or other release pending trial, sentencing, appeal, or completion of a sentence for an offense under Federal, State, or local law.

### D. Nature and Seriousness of Danger

With respect to the nature and seriousness of the danger to any person or the community that would be posed by Defendant's

---

[11] In 1992 Defendant was charged by the East Providence police with driving a motor vehicle with a suspended license and failing to appear in answer to a summons. However, both of these charges were dismissed on January 19, 1994. The Court views the dismissal as equivalent to exoneration.

release, the Government has not suggested that Defendant's release would pose a danger to any specific person or to the community.

## V.  Finding Re Risk of Flight

The burden is on the Government to show by a preponderance of the evidence that there is no condition or combination of conditions which could be set to reasonably assure Defendant's appearance.  The Court finds that the Government had failed to meet its burden for the following reasons.

First, although the Government suggested at the hearing that the potential penalty Defendant faces for these offenses is so great that it provides a strong incentive for him to flee, the Court is not so persuaded.  The circumstances of the offenses appear to indicate that Defendant's intent was not to inflict economic harm by obtaining loans and then not paying them, but to assume a new identity.  Indeed, if Victim MacEoghan had not discovered that Defendant had adopted his identity, Victim MacEoghan may have remained unaware of Defendant's actions because it does not appear that any economic loss would have resulted. Thus, this is a case where a downward departure from the sentencing guideline range for identity theft may be in order.  The Court concludes that the length of potential imprisonment which Defendant reasonably may face if convicted on all counts is not so great as to create an overwhelming incentive to flee.

Second, it would be difficult for Defendant to flee this

country.  He has no passport.  Olesya in her declaration states that he is not a Russian citizen and cannot obtain Russian citizenship according to the Russian Citizenship Law, as he did not file within the requisite period under Russian law.  See Olesya Decl. ¶ 6.  The Court need not determine whether Olesya is correct in her belief.  It is sufficient for the Court to note that Defendant apparently came to the United States with two passports from the former U.S.S.R., that those passports are in the possession of the Government, and that Defendant's U.S. Passport has been revoked.

Third, Defendant has strong ties to the District of Rhode Island in that his wife, son, and close friends are here.  If he were to flee, he would either have to abandon his family, a possibility this Court thinks is unlikely, or take his wife and young son with him, a circumstance that would make flight triply difficult.

Fourth, the Court is favorably impressed by both the number and the quality of the persons who have expressed full confidence in Defendant and back that expression of confidence with a willingness to pledge their homes or cash as bail.  These persons attest that they have known Defendant for years and believe that he is a person of good character and not a flight risk.  The Court attaches significant weight to their opinions.

In sum, the Court's assessment of the risk of flight in this

case is that it is at most moderate and that it can be addressed by requiring the posting of surety bail and imposing home detention with radio frequency monitoring.

## VI. Finding Re Dangerousness

The burden is on the Government to show by clear and convincing evidence that no condition or combination of conditions governing Defendant's release will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(f)(2). The Government has not suggested that Defendant's release would pose any danger, and the Court finds none.

## VII. Conditions of Release

For the reasons stated above, Defendant is ordered released on the following terms and conditions:

1. Defendant must post surety bail in the amount of $250,000.00. The surety may be in the form of real estate or cash or any combination of the two.

2. Defendant is confined to his residence in Warwick, Rhode Island, with radio frequency monitoring, and may only leave for purposes of employment, religious services, medical and dental appointments, conferences with his attorney, court appearances, or other activities approved in advance by the supervising probation officer.

3. Defendant's travel is restricted to the Districts of Rhode

Island, Massachusetts, and Connecticut.[12]

4.  Defendant shall report to the U.S. Probation Department as instructed.

5.  Defendant shall actively seek or maintain employment.

6.  Defendant shall surrender any passport to the Clerk of the Court and refrain from obtaining another passport.[13]

7.  Defendant shall not violate any federal, state, or local laws.

8.  Defendant shall not possess a firearm, destructive device, or other dangerous weapon.

9.  Defendant shall refrain from the excessive use of alcohol and any use or possession of a narcotic drug or other controlled substance unless prescribed by a physician.

10.  Defendant shall report to his supervising probation

---

[12] During the April 21, 2011, hearing Mr. Gonet explained that most of his company's roofing jobs are now located in Massachusetts and Connecticut. As a result, the Court stated that it would allow Defendant to travel to Massachusetts and Connecticut for purposes of employment, but that he must return each night to Rhode Island. At the conclusion of the hearing, Defendant's counsel requested that the Government return Defendant's driver's license and offered to stipulate at trial that a copy of the license should be considered the same as the original. Counsel for the Government declined to do so, stating that the license was evidence. Because the lack of a driver's license may make it necessary for others to drive Defendant to and from job sites in Connecticut and Massachusetts, the Court will allow Defendant to stay overnight in Connecticut and Massachusetts for employment purposes provided he obtains permission in advance from his supervising probation officer and the probation officer is able to confirm with Defendant's employer the location where Defendant will stay and that the overnight stay is reasonably necessary for employment purposes.

[13] It is the Court's understanding that Defendant does not possess any passport. This condition is included, therefore, to insure that Defendant does not obtain a passport while this matter is pending.

officer as soon as possible any contact with law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop.

## VIII. Conclusion

For the reasons stated, the Government's request that Defendant continue to be detained is DENIED, and Defendant is released on the above conditions.

So ordered.

**THIS ORDER IS STAYED PENDING THE GOVERNMENT'S APPEAL TO CHIEF JUDGE MARY M. LISI.**

ENTER:

/s/ *David L. Martin*
DAVID L. MARTIN
United States Magistrate Judge
April 25, 2011